Okay, we need Flanagan and Boehning. Is that right? Counsel, you have a minute? My name is Jeff Hasler. I'm a plaintiff in this case. I'm going to start by apologizing for my name. I did not write the briefs, although my name is on it. I take responsibility for it. Speak up because we're being recorded. Can you hear me? I'm not worried about me. Okay, so it would have been decidedly different. Nonetheless, I told Mr. Hummer that as well. Having said that, I'm not going to go through the facts. You have the briefs, you have the transcript, you know exactly what went down. Obviously, there are two primary issues on the field in this case. One is our belief that a de facto verdict motion should have been granted at the end of the plaintiff's case. I'm sorry, at the end of the case, on the issue of contributory negligence. And I'll talk about that in a moment. And I think a pretty interesting issue with regard to the Dead Hand Act and whether it actually exists any longer in the state of Illinois, if it moves over against me on that one, I think it's going to be kind of interesting. As the Court is well aware, proximate cause, especially in a medical malpractice case, cannot be based on speculation. It cannot be contingent. It cannot be based on mere possibility. That is not enough. In this case, there was no indication whatsoever of a link between Mr. Flanagan's failing to make the appointment in August with Dr. Pang and his ultimate demise. None whatsoever. The only two experts who could have testified in this case on that, one were oncologists, one was Dr. Allen that was put on by the defendants, and Dr. McCracken put on by me. Dr. Allen, the defendants' expert, stated that in August, if in fact Mr. Flanagan had been tested, he believed that he didn't have cancer at that time. It was more likely than not that he did not have cancer. If Mr. Flanagan, according to Dr. Allen, did not have cancer in August, then missing the appointment meant nothing. Dr. McCracken stated that he believed he either had a precancerous condition or stage one, at which he was absolutely and totally curable. If I may, the difference, if you will, between our argument and that being made by the defendant at this point can be found in Mr. Unrest's brief on page 20, in which he states, Flanagan claims that as a result of the defendant's conduct, Flanagan did not see Dr. Pang in time. And yet the fact remains that had Flanagan kept his appointment, he would have seen Dr. Pang in time. If Bainey's failure to ensure that Flanagan saw Dr. Pang as the proximate cause of his injury, then so too is Flanagan's decision to miss the appointment. That is wrong. That is absolutely wrong. It would be right at some point. That point would be the point at which Mr. Flanagan went to the doctor and the doctor said, hey, there's nothing we can do for you anymore. You waited too long. But that's not what happened. Not only was he curable in August, but he was curable and completely curable in February when he did show up to that appointment. If the court will recall, and going back, this case actually turned out to be more won on the February 28 appointment than it did the missed appointment in August. I did not ask, for example, and Mr. Unrest spent some time talking about my complaint. I did not ask, I'm pretty sure, Ms. Bainey or anybody about her re-referring him to anybody after the August visit. I didn't ask that. It's in the complaint, but that's not what came out during the course of the trial. I stayed away from that. But I did ask her about referring him when he came in in February and when she had the information available to her, when she still had the same concerns about a deadly disease that he might be walking around with, when she had information available to her about the Black Terry schools that she never spoke to him about and had the opportunity to talk to him about then. And that's when I asked her, did you do this or did you do that, or why wasn't that done? At that time, he was still completely and totally curable by both Dr. Allen and Dr. McCracken's opinion. Missing the appointment in August made no difference because he was curable in February. I've cited the court to a couple of cases, including the Owens case, but if I may, and I'm going to talk about Owens maybe a little bit later, there is another case I'd like to refer to, and that's the case of Townsend. And that case is 318.03.406. And in that case, we have a situation that's similar. And here's what the court said, and this is when the plaintiff did not provide sufficient proof. We do not say that no testimony by plaintiff's experts could have satisfied the causation of death. We simply hold no such evidence exists in this case. Saying her chances for survival would go from zero to 60 percent if relief had been provided does not address the causation yet. That is exactly what we have in this case. You can talk, and I suspect Mr. Onrath will, regarding the percentages, but that wasn't the issue. He was curable in February. By curable in February, missing the appointment in August made no difference. It led to pure speculation by the jury, and, of course, they came back. Mr. Onrath, in a brief, talks about the instruction. The issue of the adage in this case was so intimately tied to the evidence, and, in fact, the Hall case that I submit to the court says that. But there are a couple of other cases. One is called Gaskins, 166, and lap 30, 1996, in which not only did the court take away the proximate cause issue, but was found incorrect by not instructing the jury on what to do with that issue now that it had been taken away. And the Soukis case, T-S-O-U-K-A-S, 315, and lap 30, 372. That case has a whole instruction exactly like we have in this case. It talks about the Verdict B form, and, in that case, the court said we cannot tell because it says either they didn't reach the standard of care or he was more than 50 percent at fault. We cannot figure out which one the jury relied upon. Therefore, we're going to reverse the remainder. Exactly the situation that we have today. The dead man bill. A pretty interesting point. This is the way it went down in deposition. During the course of deposition in Miss Heisinga, Mr. Price asked her what she had available to her, and one of the things that she had available was Mr. Flanagan's deposition testimony, which was taken by me to perpetuate testimony as he was dying. The case had not yet been filed. Although, obviously, there hasn't been a filing in order to take a deposition. He asked her, did you see anything in there with regard to when he was told about the appointment? She said, yes, and then she said, this is the point at which he, I don't know, jumped on it. She said, yes, and I believe him. And if you read the transcript at trial, that's where he went to open up the door when I had not opened it up at all during the questioning of Heisinga or any other witness. I never asked anybody to put their own gloss on those records. I never asked anybody to interpret those records. I only asked them, what does the record say? That was it. When Mr. Price got up to cross-examine Ms. Heisinga, he asked her that question. And then he said, and you believed him, didn't you? And she said, yes, and then that's when, and we had a huge discussion beforehand, and Mr. Unrath, our rival, raises this in his deposition that I didn't object. The Court will note that there was a huge discussion. The Court indicated that I did not waive that issue because we had a significant amount of discussion about it. And based upon that, he was allowed to open the door and ask questions about what Ms. Bainey did and didn't do, what she thought and didn't think, because he opened the door, I never did. I never put a gloss on it at all. And so we wound up in a situation where the defendant opened the door, based on cross-examination, when I had not opened the door in the least. That caused me to be placed in an incredibly difficult position because I said to the judge, Your Honor, if you're going to allow me to do this, I may have to use the deposition, the videotape deposition of Mr. Pliny, when I hadn't planned on using it at all. And he said, and I think it's in the record, that if I did not put it in, I would be facing a missing-witness instruction. So by allowing the defendant to open the door on the dead man's act, when I did not open the door in any way, doing it through the back door where they could not do it through the front, I was forced into using the deposition testimony of Mr. Pliny when I never would have used it. And it was mine and mine alone to use. I provided the court with a couple of cases that say that that pretrial deposition was mine, and it was in the mystical testimony until I put it in. I had the right to use it, and only I had the right to use it. But I was forced into using it because the door had been opened, and they had now heard Huizinga apparently saying, Yeah, I believe you. And by the way, the most important part of that entire scenario is it had nothing to do with Huizinga's opinions at all. She was not questioned one iota about that. Her opinions were on the standard of care of Agnes Bainey, not whether she believed Darren Flanagan or not. It was not relevant to her opinion, and clearly it was not material to her opinion. Her opinions as a PA was the standard of care of Agnes Bainey, and that was it. It had nothing to do with her opinion. And yet the door was open, and I then was forced to use the deposition. I think I've cited the case with the pink case, which talks about my not waiving anything with regard to the deposition, the taking of the deposition for it to perpetuate testimony. There is another case. I can't remember the name of it. It's a Federal Rural Service case. It's in there. I tried to find it. It's impossible to find. Hopefully you can. I can't. I contacted innumerable law schools trying to get it, and we couldn't find it. But that was a case, and it's in Callahan's that was referred to that says the taking of the deposition that I took to preserve testimony is not a waiver. I don't think I have anything else, unless there are any questions. Thanks, Counselor. Good afternoon. May it please the Court. My name is Craig Unrad, also. I'd like to first start off by suggesting that I'm so glad this case is not being heard in the middle of July or August. This is a very unusual case. Plaintiff claims that the trial court erred and instructed the jury on contributory negligence, claiming that there's no evidence of proximate cause. Now, how do they arrive at that point? Plaintiff's counsel arrives at that point by adopting the testimony of our expert. Our expert said that if Mr. Flanagan had attended that initial August 2004 appointment with Dr. Ang, our expert said that chances are they would have found nothing because stomach cancer has very few symptoms. Even when he was talking over a year, year and a half later, they still had to perform a biopsy to identify it. It just wasn't clear. So they said, no, that appointment was unnecessary. Counsel is relying on our expert to say that missing that appointment was unnecessary. Now, we, on the other hand, are relying on his expert. His expert says that if we had pushed, if we had bowled up, if we had gotten that patient to that referral in August 2004, something would have been found. Something would have been found that would have profoundly affected the course of his disease. Clearly, the jury had a right to believe one expert or the other. So in a trial, we don't know which trial that's going to come out. If they believe plaintiff's expert, well, certainly missing that appointment was crucial to the case, and contributory negligence is necessary. Now, overall, the strangest thing about this case, and I've never run across this in my entire professional career, is that we have both parties using the other science experts to prove their argument, which, for my part, kind of boggled my mind in the beginning. If we believe plaintiff's experts and the jury had every right to do so, then missing the 2004 appointment had a profound effect on Mr. Flanagan's medical condition. The entire basis of their claim is that it was defendant's fault that he did not attend that appointment and that we did not re-refer him later on in February. We say the opposite. We say it was Mr. Flanagan's fault for missing that appointment, that we can only do so much. We're a high-volume medical practice. The best we can, and this is an individual that doesn't even have a telephone, the best we can do is to give him a referral and get him to go. If he doesn't go, that's something that the jury has to consider.  In opening statements, Mr. Ezra said the question in this case is whether or not Mr. Flanagan cared for his life, or words to that effect. And what that means is whose fault is it that he missed those appointments? Is it Mr. Flanagan's fault or is it the defendant's fault? So our position is that contributory negligence is infused in this case. It's implicit in the case. On a common-sense level, the jury cannot even look at this case without considering one big question. Whose fault was it that he didn't attend that August 2004 appointment and subsequent appointments after that? Now, in the briefs, both the initial brief and the reply brief, they say missing the appointments made no difference. And this is where, quite frankly, I just don't get it. Look at the allegations of the complaint. They allege that the defendants were negligent because they failed to timely refer Flanagan to a specialist and or failed to timely follow up with them concerning that referral, meaning when he missed the appointment, we failed to follow up. They further allege that defendants failed to inform Flanagan of the risks inherent in not following up. Well, this has got proximate cause written all over it, and if they're telling us that missing those appointments was irrelevant, well, then this case should have been dismissed before trial. I don't understand what the case is about anymore. It comes down to this. If the jury believed Plano's expert's testimony, then seeing that specialist in August 2004 was a critical factor in his medical condition. Therefore, the next question is, whose fault was it? And that's a question that Plano himself introduced at trial. We also take issue with the notion that contributing negligence somehow infected the verdict here, that this somehow turned the tide in this case. We have a very good expert here, Dr. Allen. He testified that stomach cancer presents with hardly any symptoms at all, and what symptoms it does have mimic other non-life-threatening illnesses. He says that almost all stomach cancers are discovered at a late stage, which is the reason why stomach cancer is considered fatal. Only 10 percent of patients are discovered with stomach cancer prior to stage four. Now, if the jury listened to that testimony and believed it, well, then we have a verdict for the defendants, and we never even have to address contributory negligence. The question of missing appointments or not missing appointments suddenly disappears. Now, with the Court's permission, I'll move on to the Dead Man's Act. Plano's entire case was infused with a single question, a single theme, pardon me. If it's not charted, it's not done. And they kept repeating that over and over and over again, and they used this as a device to explain precisely what was said between Nurse Fainting and Mr. Flanagan during his medical examination. Now, the medical records show that Mr. Flanagan complained of black, tarry stools. And they asked, well, did Nurse Fainting explain to him the significance of that? Did she tell him that there were possible causes? Some of them might be gastritis, could be reflux, could be any number of things. Did she ever mention that it might even be a malignancy? And these are questions that were asked very carefully, repeatedly, with their expert witness, and their expert witness said, no, there's no evidence in there. If it's not charted, it's not done. Nurse Fainting never told her anything about the importance or the significance of that symptom. They looked at the referral to Dr. Ang, and they said, did Nurse Fainting ever tell the plaintiff why it's so important that he go see Dr. Ang, the gastroenterologist? Well, they looked at the records, they see nothing. They said, not charted, not done. And they tell the jury, this is what happened during this examination. She handed him a sheet of paper, a referral that said, see Dr. Ang, and then apparently just walked away. Didn't tell him why. Didn't explain the reason for it. It's not charted. It's not done. That was their thing. And this is a device. This is a device to get around the Dead Man's Act. This is a device to recreate a conversation between our defendant and the deceiver. Now, the law on this is very clear. We have the home vizia case that states that one of the primary purposes of the Dead Man's Act is to equalize the positions of the parties in regard to giving a testimony. Allowing plaintiff's counsel to introduce his version of what Nurse Fainting said to Mr. Flanagan, what he said, or what she said, and what she did not say, without giving an equal opportunity to Fainting to give her own side, is fundamentally unfair. Now, under the Supreme Court's ruling in Holm, as well as subsequent appellate decisions in Malinowski, which we cited in our brief, there's also a 2012 decision in Fleming. It would be fundamentally unfair to deny Nurse Fainting an opportunity to explain just what happened in those cases, particularly after their own expert has, in effect, told the jury that Nurse Fainting didn't tell her anything. Plaintiff did much, much more than introduce the medical records in this case. Just like the Malinowski case, plaintiff's counsel used the medical records to explain what was not said during the Flanagan medical examinations. He put a gloss on those records, he put a very high gloss, that purported to inform the jury exactly what was said, and that was presented to the jury as fact. Under these circumstances, we find that the protection under the Dead Man's Act has been waived. If there are no further questions from the court, we urge the court to affirm the trial court's judgment. Thank you very much. One thing I do want to point out is in the Olin case, which is in the brief, there is a reference to the restatement seconded to us, which states the following. Talking about contributory negligence. The plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it. A substantial factor. Mr. Ungrad stated that, and I tried to write down what he said, that by missing the appointment in August, it had a profound course of the disease. That is incorrect. That is absolutely incorrect. That was not the evidence. Because in February, he was just as curable as he was in August, according to the testimony. Therefore, it was not substantial and it did not have a profound effect. Mr. Ungrad talked about the missed appointment itself. I never denied he missed the appointment. I got up in the opening and specifically said that. He points out one portion of my opening, but the rest of that opening was, this is not a case about appointments missed. This is a case about appointments he made. And that's right. It's about the appointment that he showed up in February 28th of 2005 when she had all of that ammunition and all of the information to impart to him and failed to do so. And I said this in opening. I may have said it in close as well. When Darren Flanagan left his appointment on February 28th, 2005, there was only one person in the world who had an understanding or an inkling that he might be suffering from a deadly disease. One person. And one person only. And that was Agnes Boehner. And she had him in that office. She had the availability of telling him that. She had the availability of retesting him. She had the ability of giving him ideas of what was going on. And he walked out of that office without knowing any of that. Again, Mr. Ungrad talked about my complaint, but that's different than what was the evidence. Maybe I should have. Well, I apologize. Maybe I should have made a motion to conform to pleadings of the proof thereafter. But the proof was different than that complaint. I did not talk about re-referring after the August appointment. I did in February, but not between August and February. Interestingly enough, with regard to Dr. Allen, the testimony that he gave, he definitely went off as 213. But the bottom line is that he didn't think at the time that Mr. Flanagan was suffering, more greater than not, that he was not suffering from cancer at the time in August. Therefore, and Dr. McCracken said he's equally cured. Lastly. With regard to Holmes, Malodowsky, and I guess one, I think Fred Flanagan. Those are cases in which the plaintiff opened the door by specifically asking their expert, who then put a gloss on the record. I didn't do that. Now, Mr. Ungrad accuses me of, if he's accusing me of knowing the law, I accept that. Because yes, I was aware of the law. And yes, I asked those questions in a manner in which they would not violate the dead man's act. And knowing Holmes, I did not know Malodowsky, but I certainly knew the Holmes case. I asked those questions in a manner that would not be violative of the dead man's act. And then yet they were allowed to open the door and allow Baining, and then allowed to ask Baining as to what happened. The records spoke for themselves. I said, is this what the record says? No. Thank you. That's it. I did not ask anybody to put a gloss on it. I did not ask my experts to put a gloss on it. The records spoke for themselves. That was it. No device. That's the evidence. I don't think I have enough time. I appreciate it. Thank you, guys. Okay. Thank you for the briefs on both sides. Thank you very much. 9 o'clock tomorrow morning. All rise.